NO. 13-15197
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

W. SCOTT HARKONEN,
*Plaintiff-Appellant*,

v.

UNITED STATE DEPARTMENT OF JUSTICE and
UNITED STATES OFFICE OF MANAGEMENT AND BUDGET,
*Defendants-Appellees*.

_____

On Appeal from the United States District Court
For the Northern District of California
_____

BRIEF OF *AMICUS CURIAE*
CENTER FOR REGULATORY EFFECTIVENESS
IN SUPPORT OF APPELLANT AND IN SUPPORT OF REVERSAL
_____

William G. Kelly, Jr. (D.C. Bar No. 411594)
MULTINATIONAL LEGAL SERVICES, PLLC
1850 Fall Line Dr.
Driggs, ID 83422
(208) 354-3050
wgkelly@silverstar.com

Attorney for *Amicus Curiae*
Center for Regulatory Effectiveness

June 7, 2013

## PARTIES' CONSENT

All parties to this case have consented to the filing of an *amicus curiae* brief by the Center for Regulatory Effectiveness.

## CORPORATE DISCLOSURE STATEMENT

The Center for Regulatory Effectiveness does not have a parent corporation and no publicly-held corporation holds any of its stock.

# TABLE OF CONTENTS

PARTIES' CONSENT …………………………………………………………..i

CORPORATE DISCLOSURE STATEMENT ..…………………………………..ii

TABLE OF AUTHORITIES ...…………………………………….……………v

STATEMENT OF INTEREST OF *AMICUS CURIAE* …………….…………vii

STATEMENT OF AUTHORSHIP AND FINANCIAL SUPPORT …………….ix

SUMMARY OF ARGUMENT …………………………………………………1

ARGUMENT

I.  The Press Release Exemption in the OMB and DOJ Guidelines
    Should Not Be Interpreted as a Blanket Exemption Covering
    the DOJ Press Release in this Case. ……………………………….………..3

    A.  Appearance of the Language Concerning Press Releases
        Only in the Final OMB Guidelines Indicates that OMB
        Did Not Regard It As a Blanket Exclusion. ………………...……..5

    B.  the Interpretive Canon *Noscitur a Sociis* Applies Here
        and Dictates that the OMB and DOJ Exclusionary
        Language Concerning Press Releases Must be Interpreted
        as Qualified Such that It Cannot Be Construed As a
        Blanket Exemption. ……………………………………….……………6

    C.  OMB Guidance Confirms That the Press Release
        Exemption was Not Intended by Either OMB or DOJ
        To Cover the Press Release in This Case. ..…………………………7

    D.  OMB's Interpretation of the Press Release Exclusion Is
        Controlling. ...……………………………………………………10

II. The Fourth Circuit's Opinion in the *Salt Institute* Case Should
    Not Be Considered Relevant Precedent on Whether the IQA
    Confers a Right to Correction of Agency-Disseminated Information. …....12

A.     The *Salt Institute* Opinion Should Be Interpreted as Referring to the Correctness of the Underlying Study Data Requested in the Petition, Not the Correctness of Agency-Disseminated Information. ……………….………………12

B.     If the Language in the Fourth Circuit's Opinion Regarding the Lack of a Right to Correctness Is Regarded as Possibly Referring to a Right to Obtain Correction of Agency-Disseminated Information under the IQA, It Should Be Regarded as Dicta. At Most the Opinion Is Ambiguous on this Point, and Therefore It Should Not Be Considered Reliable Precedent. …………………………………………………15

CONCLUSION …………………………………………...………………………..17

CERTIFICATE OF COMPLIANCE …………………………………………18

ATTACHMENTS

Relevant pages of the June 10, 2002 Memorandum from OIRA to the President's Management Council.

Relevant pages of OMB's final agency-specific IQA Guidelines (Oct. 1, 2002).

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Ams. for Safe Access v. HHS*,
    399 F. Appx 314, 2010 WL 4024989 (9th Cir. 2010) ..……………………..2

*Am. Petroleum Inst. v. U.S. EPA*,
    684 F.3d 1342 (D.C. Cir. 2012) ……………………………………………….2

*Auer v. Robbins*,
    519 U.S. 452 (1997) ……………………………………………...………..11

*Bullock v. BankChampaign, N.A.*,
    ___ U.S. ____, 133 S. Ct. 1754 (2013) …………………………………….7

*Decker v. Northwest Envtl. Def. Ctr.*,
    ___ U.S. ___, ___, 133 S. Ct. 1326 (2013) ………………………………..11

*Dole v. United Steelworkers of Am.*,
    494 U.S. 26 (1990) …………………………………….…………….……..7

*Espinoza v. United Student Aid Funds, Inc.*,
    553 F.3d 1193 (9th Cir. 2008) ……………….……………….…………...17

*McConnell v. United States*,
    478 F.3d 1092 (9th Cir.), *cert. denied*, 552 U.S. 1038 (2007) ……..….…..13

*M.R. v. Dreyfus*,
    697 F.3d 706 (9th Cir. 2012)…………………………………………….11

*Prime Time Int'l Co. v. Vilsack*,
    599 F.3d 678 (D.C. Cir. 2010) ………………..………………………2, 5

*Salt Inst. v. Leavitt*,
    440 F.3d 156 (4th Cir. 2006) …………………………………2, 12, 14-16

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) …………………………….…………….……………..5

**Federal Statutes**

44 U.S.C. § 3504(d) …………………………………….……………..8, 12

44 U.S.C. § 3516 ………………………………………...…………….12

**Federal Regulations**

Department of Justice Information Quality Guidelines,
http://www.justice.gov/iqpr/iqpr.html ……………….……….………..4, 11

OMB proposed IQA government-wide Guidelines,
66 Fed. Reg. 34489 (June 28, 2001) …………………...….……………5-6

OMB final IQA government-wide Guidelines,
67 Fed. Reg. 8452 (Feb. 22, 2002) ………………………….…………6, 7, 8

OMB Notice of Availability of OMB's agency-specific Guidelines,
67 Fed. Reg. 61701 (Oct. 1, 2002) ……………………….…………………..10

OMB's agency-specific Guidelines (relevant pages),
http://www.whitehouse.gov/sites/default/files/omb/assets/omb/inforeg/iqg_oct2002.pdf. ……………………………………………………………………10

**Other Authorities**

Memorandum to the President's Management Council on
Agency Draft Information Quality Guidelines, from the
Administrator of OIRA, dated June 10, 2002 (relevant pages),
http://www.whitehouse.gov/sites/default/files/omb/assets/omb/inforeg/iqg_comments.pdf. …………………………………………………...……..8, 9

Recording of oral argument (by the court) in *Salt Inst. v. Leavitt*,
440 F.3d 156 (4th Cir. 2006), at 16:46-17:39 …………………...…12-13

*Salt Institute* petitions and agency responses,
http://aspe.hhs.gov/infoquality/requests.shtml (item 8) ....................4, 13, 14

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

The Center for Regulatory Effectiveness ("CRE," www.thecre.com) is a Washington, DC-based public interest organization dedicated to reporting, analyzing, and intervening in significant matters concerning the regulatory and information quality authorities and responsibilities of all branches of the federal government, including those under the Paperwork Reduction Act ("PRA") and its information quality supplemental directives contained in the IQA.[1] CRE's activities are overseen by a Board of Advisors comprised of former high-level OMB and OMB/OIRA officials.

CRE is widely credited with having played a significant role in advising Members of Congress and staff in their drafting and consideration of the IQA, and those credits are accurate.

CRE frequently submits comments and participates in public meetings and workshops on federal regulatory and IQA issues. Such issues have included the issue of whether OMB or the other agencies have authority to exempt certain types of information dissemination from the IQA mandates and whether agency final actions on IQA petitions are judicially reviewable under the APA.

---

[1] Hereafter we will refer to the PRA information quality directives as the "IQA." Although the IQA is not a separate Act, or an "amendment" (according to the federal Office of the Law Revision Counsel), and is often also referred to as the "Data Quality Act" ("DQA), OMB/OIRA and the courts now more often refer to it as the "Information Quality Act" or "IQA."

CRE assisted Americans for Safe Access in its Ninth Circuit litigation concerning judicial reviewability of agency action on its IQA petition concerning medical marijuana, and CRE comments on *Prime Time Int'l Co. v. Vilsak*, 599 F.3d 678 (D.C. Cir. 2012) prompted a Department of Justice motion to have the opinion amended to state that it did not address judicial reviewability. (That motion was denied.)

CRE's widely-visited website (www.thecre.com) reports and comments on developments regarding the IQA and provides an avenue for interested persons to submit comments through its forums. Specific portions of the website address "Data Quality" and OIRA activities involving the IQA.

As noted previously, all parties to this case have consented to the submission of a CRE *amicus curiae* brief.

## STATEMENT OF AUTHORSHIP AND FINANCIAL SUPPORT

CRE declares, under FRAP 29(c)(5), that no counsel for a party in this case has authored any portion of this brief, and that no party, party's counsel, nor any other person (other than CRE, its members, or its counsel) has contributed money that was intended to fund preparation or submission of this brief.

# SUMMARY OF ARGUMENT

The irony involved in this case is inescapable: DOJ indicted and tried Harkonen for alleged inaccuracies in a press release, yet DOJ claims that Congress and OIRA have immunized it from any IQA challenge to significant and harmful inaccuracies in its own press release that was widely disseminated on the Internet. We are confident that Congress and OIRA did not intend such a result, and that the law does not support the unqualified press release exemption claimed by DOJ.

In this brief, we are addressing only two jurisdictional issues and not the merits (whether in fact the DOJ press release was inaccurate and harmful to Harkonen): (1) Whether the press release exemption in OMB's guidance encompasses the DOJ press release, and (2) whether the Fourth Circuit's opinion in the *Salt Institute* IQA case should be considered relevant authority on the issue of whether there is final "agency action" reviewable under the APA.

1. Although we agree with Harkonen's *Chevron* analysis concluding that a blanket press release exemption conflicts with the plain language of the IQA and is not a reasonable interpretation of the IQA, it is also apparent that the press release exemption was not intended by OMB/OIRA to be a blanket exemption, but rather covers only press releases that announce or refer to the availability or contents of other information disseminated by the agency that meets IQA quality standards. Such a limitation of the exemption is supported by authoritative OIRA guidance

interpreting the press release exemption language, the established interpretive canon of *noscitur a sociis*, and the language of the DOJ's own IQA guidance concerning the press release exemption, which can and should be interpreted so as to be consistent with OIRA's interpretation.

2. Three circuit court decisions have considered IQA issues.[2] In two of those, *Ams. for Safe Access v. HHS*, 399 F. Appx 314, 2010 WL 4024989 (9th Cir. 2010), and *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010), the circuits invoked the deferral provisions or exemptions contained in OIRA's IQA Guidelines and did not address judicial reviewability under the APA. In the third, *Salt Inst. v. Leavitt*, 440 F.3d 156 (4th Cir. 2006), the court stated that the IQA "does not create any legal right to information or its correctness." *Id*. at 159. The district court in the present case relied on *Salt Institute* to foreclose judicial review, quoting this exact language. 2012 WL 6019571 at 11. Several other district court IQA decisions have also relied on this statement in the *Salt Institute* opinion. We therefore will address the *Salt Institute* circuit court opinion.

We contend that the above statement in *Salt Institute* was intended by the circuit court to refer only to the correctness of the information that the petitioner sought to obtain using the IQA, and not to the correctness of information

---

[2] We do not consider *Am. Petroleum Inst. v. U.S. EPA*, 684 F.3d 1342 (D.C. Cir. 2012) to be sufficiently relevant because it considered only whether a statement regarding peer review in EPA's IQA guidelines should be given any weight, and found it to be inapplicable.

disseminated by the agency. This position is supported by the use of the word "its" in the court's statement that the IQA "does not create any legal right to information or **its** correctness" (emphasis added), which clearly refers to information sought to be obtained (not information disseminated by the agency), by the facts of the case, and by other statements of the court. This was the position taken by DOJ in defending the *Salt Institute* case on appeal, and DOJ should abide by that position in the present case. Even if this statement by the Fourth Circuit is regarded as ambiguous with regard to an IQA petitioner's right to "seek and obtain" correction of information disseminated by the agency, it should either be considered dicta in the context of that case or should not be given any weight due to the complete absence of any cogent supporting reasoning.

## ARGUMENT

**I.  The Press Release Exemption in the OMB and DOJ Guidelines Should Not Be Interpreted as a Blanket Exemption Covering the DOJ Press Release in this Case.**

DOJ issued two final decisions on the IQA petitions in this case, on July 2, 2010, and on Oct. 7, 2011. In both decisions, DOJ relied on the press release exemption in its own guidelines to reject the petitions and the requests for reconsideration.

The DOJ Guidelines state that they do not apply to information "disseminated" in certain ways, including in "**press releases [sic] fact sheets,**

press conferences or similar communications (in any medium) **that announce, support or give public notice of information in DOJ**."[3] (**Emphasis added.**)  **The** July 2, 2010 DOJ final denial letter stated that "[y]our claim that the press release at issue does not fall within the exception because it does not give notice of public information in DOJ is not a reasonable interpretation of such language."

To the contrary, the DOJ press release exclusion must be read as consistent with OMB interpretation.  The DOJ press release did not "announce, support or give notice of public information in DOJ," but, rather, described events occurring outside DOJ (court proceedings and a jury verdict) that were not agency information disseminations.  Limitation of the press release exclusion to press releases that announce, support, or give notice of other information disseminated by the agency that is subject to IQA standards is consistent with the IQA, OMB's interpretation of the IQA, and OMB's interpretation of the press release exclusion in its government-wide guidelines as reflected in subsequent interpretive guidance and its own agency-specific guidelines.  Congress placed OMB, not DOJ, in charge of implementing the IQA (and PRA), and therefore it is OMB's interpretation that controls, not DOJ's.

---

[3] http://www.justice.gov/iqpr/iqpr.html.

DOJ's interpretation of the press release exclusionary language as essentially a blanket exclusion places it in conflict with OMB interpretation of the press release exclusion and the plain language of the IQA.

## A. Appearance of the Language Concerning Press Releases Only in the Final OMB Guidelines Indicates that OMB Did Not Regard It as a Blanket Exclusion.

OMB's proposed Guidelines did not contain a proposal to exclude press releases; that language was added in its final government-wide Guidelines. OIRA is, of course, very familiar with APA rulemaking requirements for public notice and comment, and must be assumed to know that a new substantive provision in a regulation would be invalid if it had not gone through APA notice and comment and was discussed and explained, unless it regarded the new "press release" exclusion as a "logical outgrowth" of the exclusions contained in the proposed Guidelines.[4] Those proposed exclusions, contained in the proposed definition of "dissemination," were for "distribution limited to government employees or agency contractors or grantees; intra- or inter-agency use or sharing of government

_____

[4] Although labeled "Guidance" in the IQA and by OMB, the requirements of the OMB Guidance are legally binding legislative (or "substantive") rules or regulations because they were promulgated pursuant to specific legislative authority, in compliance with the procedural requirements of the APA, and contain mandatory language. The D.C. Circuit had no problem with considering the OMB Guidelines to be "binding," with OMB interpretation therefore entitled to deference, in *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 685 (D.C. Cir. 2010) (citing a portion of *United States v. Mead Corp*., 533 U.S. 218, 226-27 (2001), which states at the cited pages that the courts must give deference to agency interpretation contained in rules that have "the force of law").

information; and responses to requests for agency records under the Freedom of Information Act (5 U.S.C. 552) or Privacy Act. This definition also does not include distribution limited to replies to correspondence, and subpoenas or judicial process." 66 Fed. Reg. 34489, 34493 (June 28, 2001). The *Federal Register* notice did not contain any discussion of these proposed exclusions; however the nature of the exclusions and the use of the term "distribution" in contrast to "dissemination," and use of the term "limited" to modify "distribution," indicates that OMB did not consider them to be types of information disseminated to the general public.

The final OMB government-wide guidelines added the press release exclusion in the middle of the previously proposed exclusions for information with "limited" "distribution," so that the definition of "dissemination" now excluded "distribution limited to government employees or agency contractors or grantees; intra- or interagency use or sharing of government information; and responses to requests for agency records under the Freedom of Information Act, the Privacy Act, the Federal Advisory Committee Act or other similar law. This definition also does not include **distribution limited to** correspondence with individuals or persons, **press releases**, archival records, public filings, subpoenas or adjudicative processes." 67 Fed. Reg. 8452, 8460 (Feb. 22, 2002) (emphasis added).

**B.     the Interpretive Canon *Noscitur a Sociis* Applies Here and Dictates that the OMB and DOJ Exclusionary Language Concerning Press Releases Must be Interpreted as Qualified Such that It Cannot Be Construed As a Blanket Exemption.**

6

The final OMB government-wide Guidelines did not explain or discuss the exclusion of "press releases."  However, the well-established interpretive canon of *noscitur a sociis,* meaning that "'words grouped in a list should be given related meaning,'" applies here.  *See Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990); *Bullock v. BankChampaign, N.A.*, ___ U.S. ____, 133 S.Ct. 1754, 1760 (2013).  The list or grouping of terms surrounding "press releases" indicates that they should all be considered items of "limited" "distribution" that would not amount to "dissemination" subject to IQA requirements for accuracy and quality.  The DOJ interpretation of "press release" in its final petition denials as unlimited and allowing dissemination that does not need to meet the accuracy and quality requirements of the IQA and the OMB Guidelines is contrary to OMB interpretation supported by the *noscitur a sociis* canon as well as the IQA itself.

### C. OMB Guidance Confirms That the Press Release Exemption was Not Intended by Either OMB or DOJ To Cover the Press Release in This Case.

Under the IQA, OMB was responsible not only for issuing its government-wide Guidelines, which it issued on Feb. 22, 2002, it also was responsible for overseeing the various agencies' subsequent drafting of their own agency-specific

7

guidelines and ensuring that those guidelines were consistent with the government-wide guidelines.[5]

The issue of proper interpretation of the press release exclusion in the government-wide guidelines was raised during this process of agencies drafting their own guidelines to be consistent with the OMB government-wide Guidelines. On June 10, 2002, OMB issued a Memorandum to the President's Management Council (*i.e*., all agency heads), discussing important policy issues that included discussion of the press release exclusion.[6] (Relevant pages of the Memorandum, pp.1-5, are attached to this brief.) The Memorandum stated: "Based on our review, I [the Administrator of OIRA] have attached a discussion of important issues, identified noteworthy approaches for consideration, and provided guidance on those provisions that need to be adopted in all agency guidance." At 1. The referenced attachment also stated: "This attachment discusses important policy issues raised by the agency drafts, identifies noteworthy approaches for consideration, and **provides guidance on those provisions that need to be uniformly adopted in all agency information quality guidelines**." At 3

---

[5] The OMB final government-wide Guidelines stated: "Under the OMB guidelines, agencies need only ensure that their own guidelines are consistent with these OMB guidelines …." 67 Fed. Reg. at 8453. The PRA provision in 44 U.S.C. § 3504(d), incorporated by reference into the IQA, gives OMB responsibility for overseeing implementation of the IQA.

[6]

http://www.whitehouse.gov/sites/default/files/omb/assets/omb/inforeg/iqg_comments.pdf.

(emphasis added).  The first policy issue in the attachment was "SCOPE OF

AGENCY GUIDELINES."  In this section, OMB stated:  "The OMB definitions

of 'information' and 'dissemination' establish the scope of these guidelines.  Both

definitions contain exceptions.  Agencies have elaborated upon the definitions of

information and dissemination, and the exceptions thereto, to both broaden and

narrow their scope.  **The specific examples discussed below include**

**modifications that appear reasonable and consistent with the approach OMB**

**takes in its guidelines**."  At 3-4 (emphasis added). The Attachment then discussed

a modification of the press release exception that it considered consistent with the

OMB final Guidelines and gave guidance concerning IQA compliance:

> Exemption for Press Releases. Some agencies narrowed the
> exemption in the OMB definition to provide that **the agency should**
> **already have disseminated the information discussed in the press**
> **release in another way**. For example, EPA states "These guidelines
> do not apply to press releases, fact sheets, press conferences or similar
> communications in any medium **that announce, support the**
> **announcement or give public notice of information EPA has**
> **disseminated elsewhere**" (EPA, 15). **This limitation avoids creating**
> **an incentive to misuse press releases to circumvent information**
> **quality standards.**

At 4 (emphasis added).  It is clear from the discussion of the EPA example and the

final statement regarding avoiding incentive to circumvent IQA standards that

OMB was providing guidance that in order for agency-specific guidelines to be

consistent with the OMB guidelines the exclusion for press releases must be for

press releases of the type that simply announce or give notice of agency

9

disseminated elsewhere, and both the press release and the information disseminated elsewhere by the agency must meet IQA standards.

When OMB subsequently promulgated its own agency-specific guidelines on October 1, 2002, it provided strong confirmation of this interpretation of the press release exclusion. The *Federal Register* Notice of Availability for those guidelines stated that the guidelines contained a paragraph, paragraph IV.2, that "**modifies the exemption for a press release** to provide that the information in the press release has been previously disseminated by OMB or another Federal agency in compliance with the Agency-wide Guidelines or the OMB guidelines." 67 Fed. Reg. 61701 (Oct. 1, 2002) (emphasis added). The actual language of paragraph IV.2 of the OMB Guidelines themselves[7] was very similar, stating that the guidelines do not apply to "(e) communications such as press releases, interviews, speeches, and similar statements **containing information that OMB or another Federal agency has previously disseminated in compliance with the Government-wide Guidelines or the OMB guidelines.**" At 7 (emphasis added). (Relevant pages, pp.1, 7-8, of these OMB Guidelines are attached.)

### D. OMB's Interpretation of the Press Release Exclusion Is Controlling.

The OMB instructions to agencies and modification of the press release exclusion in its own agency-specific Guidelines must be considered an

---

[7] http://www.whitehouse.gov/omb/info_quality_iqg_oct2002/.

authoritative OMB interpretation of what it meant by originally including the press release exemption in its government-wide Guidelines. The DOJ guidelines were required to be "consistent" with this OMB interpretation and modification. Thus, even though the DOJ language is somewhat different from the EPA example given by OMB and the language of the OMB-specific Guidelines – excluding "press releases fact sheets, press conferences or similar communications (in any medium) that announce, support or give public notice of information in DOJ" – it should be clear that such language can and must be read in a manner consistent with how OMB later interpreted its original meaning in the government-wide guidelines.

As the agency given statutory responsibility for implementing the IQA, OMB's interpretation of the press release exemption in its Feb. 22, 2002 government-wide final Guidelines is "controlling" or entitled to substantial deference unless "plainly erroneous or inconsistent with the regulation," and it does not matter that the OMB interpretation was issued after its government-wide Guidelines. *Decker v. Northwest Envtl. Def. Ctr.*, ___ U.S. ___, ___, 133 S. Ct. 1326, 1337 (2013); *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997); *M.R. v. Dreyfus*, 697 F.3d 706, 735 (9th Cir. 2012). The OMB interpretation is obviously not plainly erroneous or inconsistent with its government-wide regulations, as discussed above, and was necessary in order to avoid potential conflict with the mandate of the PRA and IQA in 44 U.S.C. §§ 3504(d) and 3516 for OMB to

11

develop and oversee rules and regulations applying to Federal agency

"dissemination" of public information "regardless of the form or format in which

such information is disseminated."

## II.   The Fourth Circuit's Opinion in the *Salt Institute* Case Should Not Be Considered Relevant Precedent on Whether the IQA Confers a Right to Correction of Agency-Disseminated Information.

The district court relied on the Fourth Circuit's opinion in *Salt Inst. v.*

*Leavitt*, 440 F.3d 156 (4th Cir. 2006), in holding that the IQA confers no legal right

that would support judicial review under the APA.  2012 WL 6019571, at 11 and

12 (N.D. Cal. 2012).

### A.   The *Salt Institute* Opinion Should Be Interpreted as Referring to the Correctness of the Underlying Study Data Requested in the Petition, Not the Correctness of Agency-Disseminated Information.

The petition at issue in *Salt Institute* challenged the correctness and

reproducibility of non-government studies and requested that HHS furnish the raw

data underlying those studies. It did not ask for correction of any particular agency

dissemination. The case therefore did not raise an issue of a petitioner's right to

correction of an agency dissemination.  This was the position of the Fourth Circuit.

It was also the position of the Department of Justice in arguing the case before the

Fourth Circuit.  DOJ stated at oral argument:

> So then we come to what they call their request to correct information.
> And I would be happy to address all the legal issues that would have
> arisen if they had actually made a request, but reading from their letter

to the agency – and they say this in various forms throughout the letter – This is page A-39 – "Because this petition is based solely on the agency's failure to make study data publicly available, petitioners do not at this time request or recommend the challenged information be removed from public view; however, should petitioners determine upon review of data that the interpretations cannot be reproduced, petitioners reserve the right to pursue additional Data Quality Act challenges." Which is fine – **we're not saying that there could never be a ripe question about whether you could get judicial review of a correction request under the IQA, we just don't have one here.**

Court recording of oral argument at 16:46-17:39.[8]

At issue in the case were the findings of non-governmental scientific studies. The results of the studies were disseminated in various releases by HHS and the National Heart, Lung, and Blood Institute ("NHLBI"). The Salt Institute complained that it could not attempt to reproduce the study results and check their correctness unless the agency furnished the raw data underlying the studies. The agency interpreted this petition request as in actuality a Freedom of Information request – a request to make data available. Because the raw data were not under the control of the agency and were not subject to the "Shelby Amendment" to FOIA (requiring release of underlying data produced under a government grant after a certain date), the agency denied the request. The Salt Institute, as DOJ asserted at oral argument in circuit court (see above), challenged the correctness of

---

[8] This court may take judicial notice of the appellate materials in another case cited by a party as precedent. *McConnell v. United States*, 478 F.3d 1092, 1096 n. 4 (9th Cir.), *cert. denied*, 552 U.S. 1038 (2007).

the non-governmental studies due to the agency's failure to make the raw data
underlying the studies available.[9]

A full reading of the Fourth Circuit's opinion indicates that the court viewed
the Salt Institute's petition as a request for data that would allow it to check the
correctness of the non-governmental study findings, not a request for the correction
of agency-disseminated information.

At the outset of the opinion, the Circuit panel described the petition as one
"which **purported** to be filed pursuant to the Information Quality Act," and which
"took issue with the findings of two studies that were funded in part by NHLBI."
*Salt Institute*, 440 F.3d at 157 (emphasis added).  The opinion then stated that
"Appellants' petition for correction asserted that the **studies'** findings do not meet
the standards for data quality set out in the IQA ...."  *Id.* (emphasis added).  The
opinion next stated that the petition "requested that NHLBI 'make publicly
available' the raw data that supported the studies' findings in order to allow
appellants to test their validity for different groups of individuals."  *Id.*  The court
described this as the "lone request" made by the petition.  *Id*.

Further on in the opinion the court stated:

In this case, we have not decided (and need not decide) the question
whether appellants' alleged injury is sufficiently concrete and

---

[9]   The Salt Institute petitions and agency responses can be found on the HHS
information quality website at http://aspe.hhs.gov/infoquality/requests.shtml (item
8).

specific.  Rather, we have decided the antecedent question whether Congress has granted **a legal right to the information**.  …  The IQA does not create any legal right to information or **its** correctness.

*Id*. at 159 (emphasis added).  In using the word "its," it appears the court was referring to a right to the correctness of the non-governmental study findings.  As indicated above, filings before the agency suggested only that petitioner sought to obtain the underlying data for those studies in order to check the correctness of the non-governmental study findings.

**B.**     **If the Language in the Fourth Circuit's Opinion Regarding the Lack of a Right to Correctness Is Regarded as Possibly Referring to a Right to Obtain Correction of Agency-Disseminated Information under the IQA, It Should Be Regarded as Dicta.  At Most the Opinion Is Ambiguous on this Point, and Therefore It Should Not Be Considered Reliable Precedent.**

There is a section of the Fourth Circuit's opinion that contains broader language than that quoted above and that could be argued to be a more general ruling on whether the IQA provides **any** rights to the correctness of information, whether it is non-governmental information or agency-disseminated information.  The opinion states at one point:

By its terms, this statute [the IQA] creates no legal rights in any third parties. [Footnote omitted.] Instead, it orders the Office of Management and Budget to draft guidelines concerning information quality and specifies what those guidelines should contain.  Because the statute upon which appellants rely does not create a legal right to access to information or to correctness, appellants have not alleged an invasion of a legal right and, thus, have failed to establish an injury in fact sufficient to satisfy Article III.

*Salt Institute*, 440 F.3d at 159. This statement by the court does not contain the word "its" ahead of "correctness" as in its subsequent statement quoted above, and states that the IQA creates "no" legal rights.  In addition, the actual petition documents might be construed as also challenging the accuracy of the agency releases describing the non-governmental studies.  However, in the context of the rest of the case and the various other statements in the opinion, it does not appear that the court was focusing on an issue of the right to obtain correction of agency-disseminated information.  This view appears to be clearly supported by the (omitted) footnote at the end of the first sentence of the above-quoted statement, which addresses only the "claimed right to information" under FOIA and the "Shelby Amendment" to FOIA.  Moreover, if the court had been focusing on the issue of whether the IQA confers a right to obtain a correction of agency-disseminated information, it surely would have addressed the "seek and obtain" language in the IQA. It also would have confronted the express language of the APA defining "agency action" to include denial of a petition for relief, as well as the cases providing judicial review of agency denial of a petition.   Viewing the totality of the opinion, the single statement that the IQA confers "no" legal rights should be regarded as dicta.  At most, the opinion and record are so ambiguous on this point, and so lacking in supporting reasoning, that the case should not be

regarded as reliable authority on the issue of a legal right to "seek and obtain" correction of agency disseminated information.[10]

## CONCLUSION

The OMB interpretation of the "press release" exclusion is controlling, and the DOJ press release exclusion must be, and can be, read to be consistent with the OMB interpretation. Therefore, the press release in this case is covered by the IQA. Under the express terms of the IQA and APA, Harkonen had a right to petition to "seek and obtain" "relief" in the form of correction of an inaccurate press release, and consequently had a right to judicial review of the agency denials. *Salt Institute* should not be considered authority to the contrary. The district court erred on these points, and therefore it should be reversed.

Dated: June 7, 2013       /s/  William G. Kelly, Jr.

William G. Kelly, Jr. (D.C. Bar No. 411594)
MULTINATIONAL LEGAL SERVICES, PLLC
1850 Fall Line Dr.
Driggs, ID 83422
(208) 354-3050
wgkelly@silverstar.com

Attorney for *Amicus Curiae*
Center for Regulatory Effectiveness

---

[10]  Like other federal circuits, this Circuit feels free to disagree with a sister circuit when it considers that the sister circuit's opinion is not supported by persuasive reasoning. *See, e.g., Espinoza v. United Student Aid Funds, Inc*., 553 F.3d 1193, 1202 (9th Cir. 2008).

17

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1, this *amicus curiae* brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B)(i) and 29(d) because it contains 4,133 words, according to the word count function of Microsoft Word, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

Dated:  June 7, 2013                                         /s/  William G. Kelly, Jr.
                                                                  William G. Kelly, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit on June 7, 2013, by using the appellate CM/ECF system.

I certify that all attorneys of record in this case are registered CM/ECF users and that service with be accomplished by using the appellate CM/ECF system. I also hereby certify that I will cause attorneys of record and the Court to be served with such paper copies of the brief as the Clerk of the Court might subsequently direct.

Dated: June 7, 2013          /s/ William G. Kelly, Jr.

William G. Kelly, Jr. (D.C. Bar No. 411594)
MULTINATIONAL LEGAL SERVICES, PLLC
1850 Fall Line Dr.
Driggs, ID 83422
(208) 354-3050
wgkelly@silverstar.com

Attorney for *Amicus Curiae*
Center for Regulatory Effectiveness

June 10, 2002

MEMORANDUM FOR PRESIDENT=S MANAGEMENT COUNCIL

FROM:       John D. Graham

SUBJECT:    Agency Draft Information Quality Guidelines

The quality of information disseminated to the public by the Federal Government needs to be improved.

Reflecting this need, Congress recently directed OMB to issue government-wide guidelines that Aprovide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies.@ The Administration is committed to vigorous implementation of this information quality law.

OMB issued government-wide information quality guidelines on September 28 last year. Each Federal agency is now required to issue its own guidelines that will ensure the quality of information that it disseminates. These guidelines must include mechanisms to allow the public to seek correction of disseminated information that does not comply with the information quality standards in the OMB or agency guidelines. To permit public participation and comment, and to facilitate interagency coordination, agencies are expected to make their draft guidelines available for public comment.

My staff and I have completed a preliminary review of the draft agency guidelines currently available for public comment. We want to thank you for the substantial effort and careful deliberation reflected in the agency drafts. Agencies, with highly diverse program responsibilities, disseminate a wide variety of kinds of information to serve many different purposes. The agency drafts properly reflect this variety.

Some agencies have developed particularly noteworthy provisions that I would suggest for consideration by other agencies in reviewing and revising their own draft guidance. I would also like to point out some provisions in agency drafts that do not appear consistent with the text and intent of the OMB guidelines or are otherwise contrary to Administration policy.

Based on our review, I have attached a discussion of important issues, identified noteworthy approaches for consideration, and provided guidance on those provisions that need to be adopted uniformly in all agency guidance. I request that you send this attachment to the appropriate officials who are responsible for developing your agency=s information quality guidelines.

We have asked agencies to submit draft final guidelines to us for review by August 1 (which we have extended from an original July 1 deadline). We encourage you to use this extra time to extend your public comment period. In light of the recent decision to allow additional time for agencies to extend the period for public comment on agency guidelines (and thus compress the time available for final OMB review), it is my intention to have these OIRA comments considered in conjunction with public comments as agencies shape their final guidelines.

As a related matter, I should note that Mark Forman of OMB is leading work on a content model for presenting information on the web. It will include guidelines on how to present web content, how agencies should identify web-based material, and general guidelines for what should go on the public internet.

Attachment

June 10, 2002

**OIRA REVIEW OF**
**INFORMATION QUALITY GUIDELINES DRAFTED BY AGENCIES**

By October 1, 2002, agencies must publish in the *Federal Register* a notice that the agency=s final guidelines are available on the Internet. Agencies must also provide OMB an opportunity to review each agency=s draft final guidelines before they are issued. Drafts must be submitted to OMB no later than August 1.

The underlying legislation is Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106-554; H.R. 5658). The OMB Information Quality Guidelines can be found in the *Federal Register* for September 28, 2001 (66 FR 49718), and, as amended, for February 22, 2002 (67 FR 8452).

This attachment discusses important policy issues raised by the agency drafts, identifies noteworthy approaches for consideration, and provides guidance on those provisions that need to be uniformly adopted in all agency information quality guidelines. We urge that draft guidelines submitted for OMB review reflect consideration of this guidance as well as the public comments.

I. SCOPE OF AGENCY GUIDELINES.

In this topic, we discuss a number of constructive approaches agencies used to define the kinds of information that are covered by their guidelines. In some cases, we refer to provisions from agency drafts. These examples are quoted at the end of this attachment.

We cite these agency draft provisions as useful constructive approaches. We caution, however, that these examples are only agency proposals. Based on public comment and other review, the agencies may further refine these examples.

The OMB definitions of Ainformation@ and Adissemination@ establish the scope of these guidelines. Both definitions contain exceptions. Agencies have elaborated upon the definitions of information and

- 3 -

dissemination, and the exceptions thereto, to both broaden and narrow their scope. The specific examples discussed below include modifications that appear reasonable and consistent with the approach OMB takes in its guidelines, as well as suggestions for improvement and greater consistency with the OMB guidelines. We suggest that agencies consider these approaches for their own use.

Use of Statements of AIntent@ to Define Scope. Some agencies used statements of intent or purpose to limit the scope of these guidelines. Such use of Aintent@ clarifies the nature of the inclusion or exclusion in a way to avoid having incidental or inadvertent public disclosure undermine the practical administration of the definition or exclusion. For example, some agencies insert the concept of Aintent@ into the exemption for intra- or inter-agency use of sharing of information, e.g., exempted is Ainformation ... not disseminated to the public, including documents intended only for inter-agency and intra-agency communications@ (ED, 1 & 4). On the other hand, some agencies quote this definition as stated in the OMB guidelines literally, and do not insert a concept of intent. They may wish to include a concept of Aintent@ to avoid inadvertent public disclosure from undermining practical administration of the guidelines.

Exemption for Press Releases. Some agencies narrowed the exemption in the OMB definition to provide that the agency should already have disseminated the information discussed in the press release in another way. For example, EPA states AThese guidelines do not apply to press releases, fact sheets, press conferences or similar communications in any medium that announce, support the announcement or give public notice of information EPA has disseminated elsewhere@ (EPA, 15). This limitation avoids creating an incentive to misuse press releases to circumvent information quality standards.

Exemption for Public Filings. Some agencies refined the exemption for public filings to permit agencies to Apass through@ information not subject to the guidelines while properly applying the agency and OMB guidelines to third-party information that the agency disseminates. Agencies need to qualify the public filing exemption to ensure that the agency guidelines continue to apply to third-party information that the agency disseminates, as we discuss below under II, ACoverage of >Third-Party= Information under the Guidelines.@

Exclusion For Agency Employed Scientist, Grantee, or Contractor. The preamble to the OMB guidelines discusses situations in which the dissemination of information by an agency-employed scientist, grantee, or contractor is not subject to the guidelines, namely those situations in which they Apublish and communicate their research findings in the same manner as their academic colleagues@ and

- 4 -

thus do not imply official agency endorsement of their views or findings (67 FR 8453-54, February 22, 2002). On the other hand, an agency disseminates information Awhere an agency has directed a third-party to disseminate information, or where the agency has the authority to review and approve the information before release@ (67 FR 8454, February 22, 2002). Agencies that did not explicitly include such an exemption may wish to consider doing so, but need to do so in the carefully balanced ways quoted at the end of this attachment.

Exclusion for Testimony and Other Submissions to Congress. Some agencies exclude Ainformation presented to Congress (as part of the legislative or oversight processes, e.g., testimony of officials, information or drafting assistance provided to Congress in connection with pending or proposed legislation) *that is not simultaneously disseminated to the public*@ (Justice, 3; DOT, 9). As with the exemption for press releases, we think it would be better for agencies to narrow this exemption to provide that the agency should already have disseminated the information discussed in the testimony in another way. This limitation would avoid creating an incentive to misuse testimony and other submissions to Congress to circumvent information quality standards.

Exemption for Subpoenas or Adjudicative Processes. The preamble to the OMB guidelines states that AThe exemption from the definition of ›dissemination‹ for ›adjudicative processes‹ is intended to exclude ... the findings and determinations that an agency makes in the course of adjudications involving specific parties. There are well-established procedural safeguards and rights to address the quality of adjudicatory decisions and to provide persons with an opportunity to contest decisions. These guidelines do not impose any additional requirements on agencies during adjudicative proceedings and do not provide parties to such adjudicative proceedings any additional rights of challenge or appeal@ (67 FR 8454, February 22, 2002). Some agencies adapted the OMB exception very carefully. Other agencies may have broadened this exemption beyond OMB=s intent; they need to limit this exemption carefully to be consistent with OMB=s intent both as to the adjudicative procedures that are included and the scope of the information covered.

Effective Date. The OMB guidelines establish two somewhat different effective dates (III.4). An agency=s obligation to conduct a pre-dissemination review of information quality starts only on October 1: AThe agency=s pre-dissemination review, under paragraph III.2, shall apply to information that the agency first disseminates on or after October 1, 2002.@ An agency=s obligation to allow the public to seek the correction of information that does not comply with the information quality standards in OMB or agency guidelines starts on October 1, 2002, for information that the agency disseminates on or after

- 5 -



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. *20503*

October 1, 2002

## OFFICE OF MANAGEMENT AND BUDGET
## INFORMATION QUALITY GUIDELINES

The Office of Management and Budget publishes these **OMB** guidelines in accordance with the Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies (Government-wide Guidelines) published in interim final form by **OMB** in the Federal Register in Volume 66, No. 189 at 49718 on Friday, September 28, 2001, and updated in final form in Volume 2, No. 67 at 8452 on February 22, 2002. These published guidelines were issued pursuant to Section 515 of the Treasury and General Government Appropriations Act for FY2001 (Public Law 106–554; HR 5658). In response to the legislation and the published guidelines, **OMB** identifies the following policies and procedures for ensuring and maximizing the quality, objectivity, utility, and integrity of information disseminated by OMB; and it hereby establishes additional procedures for affected persons to seek and obtain correction of information maintained and disseminated by **OMB** that does not comply with standards set out in the Government-wide Guidelines. These OMB guidelines are intended to ensure and maximize the quality of information disseminated by **OMB.** Through these **OMB** guidelines, **OMB** establishes as its performance standard a goal of disseminating information consistent with the Government-wide Guidelines and these OMB guidelines.

OMB's predissemination review described in these OMB guidelines applies to information that OMB first disseminates on or after October 1, 2002. The administrative mechanism for correcting information that OMB disseminates described in these OMB guidelines applies to information that OMB disseminates on or after October 1, 2002, regardless of when OMB first disseminated the information.

## I.    Procedures for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Prior to Dissemination

In Government-wide Guidelines, "quality" is defined as an encompassing term comprising utility, objectivity, and integrity.

### A.    Objectivity and Utility of Information

1.    As defined in Section IV, below, "objectivity" is a measure of whether disseminated information is accurate, reliable, and unbiased and whether that information is presented in an accurate, clear, complete, and unbiased manner. "Utility" refers to the usefulness of the information for the intended audience's anticipated purposes. OMB is committed to disseminating reliable and useful information. Before disseminating information, **OMB** staff and officials should subject such draft information to an extensive review process. It is the primary

3.     OMB's Executive Associate Director or a delegee thereof (typically in consultation with the Divisions within OMB responsible for the subject matter) will consider the request for reconsideration, applying the standards and procedures set out in Section II, above and will make a determination regarding the request. In most cases, the requestor will be notified of the determination and, if appropriate, the corrective action to be taken, within 60 days of receipt. If the request for reconsideration requires more than 60 days of receipt, OMB will inform the requestor of the extension, providing its reasons for the extension and an estimated decision date. OMB will give reasonable notice to affected persons of any corrections made.

## IV. Definitions

1.     "Affected" persons are those who may benefit or be harmed by the disseminated information. This includes both: (a) persons seeking to address information about themselves or about other persons to which they are related or associated; and (b) persons who use the information.

2.     "Dissemination" means agency initiated or sponsored distribution of information to the public (see 5 CFR 1320.3(d) "Conduct or Sponsor"). Dissemination does not include the pass-through of public filings or other information received from third-parties by OMB and made available for public review through website posting or other means, without OMB's official endorsement of its content. However, these guidelines may apply to third-party information adopted by OMB.

In addition, dissemination does not include distributions of information or other materials that are:

(a)     intended for government employees or agency contractors or grantees;

(b)     intended for U.S. Government agencies;

(c)     produced in responses to requests for agency records under the Freedom of Information Act, the Privacy Act, the Federal Advisory Committee Act or similar law;

(d)     correspondence or other communication limited to individuals or to other persons, within the meaning of paragraph 7, below;

(e)     communications such as press releases, interviews, speeches, and similar statements containing information that OMB or another Federal agency has previously disseminated in compliance with the Government-wide Guidelines or the OMB guidelines; or

(f)     documents (e.g., guidance, bulletins, policy directives) intended only for inter-agency and intra-agency communications.

Also excluded from the definition are archival records; public filings; responses to subpoenas or compulsory document productions; or documents prepared and released in the context of adjudicative processes. These guidelines do not impose any additional requirements on OMB

during adjudicative proceedings involving specific parties and do not provide parties to such adjudicative proceedings any additional rights of challenge or appeal.

3. "Influential," when used in the phrase "influential scientific, financial, or statistical information," refers to disseminated information that OMB determines will have a clear and substantial impact on important public policies or important private sector decisions.

4. "Information," for purposes of these guidelines, including the administrative mechanism described in Sections II and III, above, means any communication or representation of facts or data, in any medium or form, including textual, numerical, graphic, cartographic, narrative, or audiovisual forms. This definition does not include:

(a)     opinions, where the presentation makes clear that the statements are subjective opinions, rather than facts. Underlying information upon which the opinion is based may be subject to these guidelines only if that information is published by OMB;

(b)     information originated by, and attributed to, non-OMB sources, provided OMB does not expressly rely upon it. Examples include: non-U.S. Government information reported and duly attributed in materials prepared and disseminated by OMB; hyperlinks on OMB's website to information that others disseminate; and reports of advisory committees published on OMB's website;

(c)     statements related solely to the internal personnel rules and practices of OMB and other materials produced for OMB employees, contractors, agents or alumni;

(d)     descriptions of the agency, its responsibilities and its organizational components;

(e)     statements, the modification of which might cause harm to the national security, including harm to the national defense or foreign relations of the United States;

(f)     statements of Administration policy; however, any underlying information published by OMB upon which a statement is based may be subject to these guidelines;

(g)     testimony or comments of OMB officials before courts, administrative bodies, Congress, or the media, unless such testimony contains new, substantive information not previously disseminated; or

(h)     investigatory material compiled pursuant to U.S. law or for law enforcement purposes in the United States.

5. "Integrity" refers to the security of information -- protection of the information from unauthorized access or revision, to prevent the information from being compromised through corruption or falsification.

6. "Objectivity" is a measure of whether disseminated information is accurate, reliable, and unbiased and whether that information is presented in an accurate, clear, complete, and unbiased manner.